LOTTINGER, Judge.
This is a tort action by husband and wife originally instituted against Continental Southern Lines, Inc., the owner of a Trailways bus which was involved in a collision with a bus owned by the Baton Rouge Bus Company on which the plaintiff Addie O’Conner was a passenger. The original petition recites that about 11 o’clock a. m. July 17, 1959 the Baton Rouge bus was traveling north on St. Louis Street in the city of Baton Rouge, a main right-of-way street, when it was struck by the Continental bus which had been traveling east on America Street and which, failing to yield the right of way to the Baton Rouge bus, attempted a left turn onto St. Louis Street crashing into the left side of the bus on which the plaintiff’s wife was riding. By supplemental petition the Baton Rouge Bus Company, Inc. was made a party defendant, it being averred that the driver of this bus was guilty of negligence proximately contributory to the accident in that he was traveling at an excessive rate, failed to see the other bus and failed to apply his brakes or swerve to the right to avoid a collision with the Continental bus which had negligently violated his right of way.
Each defendant answered denying negligence on the part of its driver and charging that the accident was due solely to the negligence on the part of the other driver.
The Lower Court found the defendants jointly and solidarily liable and awarded judgment against them in favor of Joe O’Conner in the sum of $1,195.56 and in favor of Addie O’Conner in the sum of $2,500. Both defendants have appealed and the plaintiffs have answered the appeals seeking an increase in the award to Addie O’Conner from $2,500 to $10,000.
The accident occurred in front of the East Baton Rouge Court House. It was witnessed by a policeman who was on duty at the time and was investigated also almost immediately after its occurrence by other officers. Excellent photographs were taken by the police department when the vehicles were still where they had come to rest after the accident. The fact that the streets were dry and the weather clear is undisputed.
The accident was investigated by Donald L. Chaney, Sergeant with the Baton Rouge Police Department. He estimated the width of America Street at 27 feet and stated that St. Louis Street at that point measured 32 feet in width. He placed the point of collision at 16 feet east of the west parallel line of St. Louis Street, 16 feet west of the east parallel line of St. Louis Street and 22 feet north of the south parallel line of America Street. He testified that in addition to the plaintiff there were three other passengers who received injuries as a result of the collision who were on the City Bus and that all four were taken to the hospital by ambulance. The officer had no notations on his report with respect to the speed of the respective vehicles but charged Lee Dunbar, the driver of the Trailways bus with a violation in failing to yield to the vehicle- approaching from his right. On cross examination the officer testified that the right front portion of the Trailways bus collided with the left side of the City Bus. He stated that the Trailways bus stopped immediately upon the impact and that it ap *382 peared the City Bus traveled on north some 112 feet before coming to a stop. Pie stated that the Baton Rouge City speed limit at that particular point on St. Louis Street was 30 mph. He described the corner from the standpoint of the Trailways bus driver as being practically a blind one due to the fact that to the driver’s right or on the southwest corner there was florist shop situated right adjacent to the sidewalk. He described the intersection as being a dead end insofar as America Street is concerned as it does not continue across St. Louis Street. He stated that there was a driveway on the east side of the St. Louis Street, being an entrance to the Court House and the New Municipal Building. At the time of the accident there were no vehicles parked in front of this driveway and the nearest parked vehicles on St. Louis Street were approximately 75 feet south of the Municipal Driveway entrance. On further cross examination the Officer stated that he arrived before any of the vehicles had been moved and that photographs were taken of the scene by Sergeant Templet of the police department. These photographs were introduced into evidence as Exhibits B-l through B-ll, inclusive. The Sergeant stated that the driveway previously referred to on the east side of St. Louis Street was restricted to City-Parish Governmental vehicles only and that there was a sign to that effect posted at its entrance. He stated that while interrogating the respective drivers, no mention was made by either of any other traffic proceeding north on St. Louis Street ahead of the City Bus. The Officer further stated that St. Louis Street is designated as a major throughway being a one way street going north and that America Street has two way traffic.
Officer Rodney Dier, of the Baton Rouge Police Department, testified that he was a witness to the accident. He stated that he was standing on the southwest corner of the intersection when the Continental Trailways Bus pulled up preparatory to making a left hand turn, that it stopped momentarily and shifted gears and that, just as it had pulled out into St. Louis Street from America Street in the process of making a left turn, it collided with the Baton Rouge Bus. He estimated the speed of the Trailways bus at 1 or 2 miles per hour at the most, and he estimated the speed of the City Bus between 25 and 30 mph just prior to the accident. He stated that he did not observe where either driver took any precautions or action to avoid the accident.
On cross examination, he said that he did not observe where the City Bus ever changed its course or turned from the direction in which it was traveling. He stated that it is permissible to park on the right side of St. Louis Street and that the City Bus was proceeding “to the far right” or, in other words, in the right lane close to where the cars were parked. He estimated that the City Bus was some 10 to 15 feet away when the Trailways Bus began to pull out into the street, and that the Trailways Bus moved from there some 10 to 15 feet to the point of collision.
Alex H. Houston called by plaintiffs on cross examination, testified that he was employed by the Baton Rouge Bus Company on July 17, 1959 and was driving their bus on that date. He stated that just prior to the accident he was proceeding north on St. Louis Street, and that he saw the Trailways Bus before it had entered the intersection at which time it was moving and at which time he was very close to it. He stated that at this time the bus was “kind of angling like” but not quite turning into St. Louis Street. He stated that at this time he was not far enough away from the Trailways Bus to have stopped had he applied his brakes. He estimated his speed from 20 to 25 miles per hour and said that he was over on his right hand side of the street. He stated that this was his regular run and that every day Trailways Bus-ses turned onto St. Louis Street from America Street. He said that he observed the Continental Bus and that its actions were similar to those usually taken by Continental Drivers as they turned into St. Louis Street. He stated that he did not at *383 tempt to avoid the collision as he was not expecting one. He said that he could not estimate the speed of the Continental bus but that it was proceeding at a slow rate.
Testifying in behalf of the Baton Rouge Bus Company, this witness stated that on the morning of the accident he was en route to his terminal which was situated on North Boulevard which was just a short block from where the accident occurred, and that upon reaching the terminal his run of the morning would have been completed. He said that he was on schedule and that he was supposed to go off duty at 11:15 which was approximately the time of the accident. He repeated that his speed was between 20 and 25 mph. He stated further that both Trailways and Greyhound busses take the America Street route into St. Louis Street and that he would see them every day. He stated again that he was in his right lane of traffic and was approximately 8 inches to a foot from the parked vehicles on the east side of St. Louis Street. He approximated that he was about a bus length from the Trailways bus when he first saw it at which time the Trailways vehicle was proceeding very slowly, and at which time he thought it was “fixing to stop”. He states that “I didn’t think he was coming on out, I never even give it a thought”. At this time he said that he did not think any part, or, if any, very little, of the Trailways Bus was into St. Louis Street. He said that he never had any indication or idea that an accident might occur as he had no idea that the Trailways Bus would continue forward. He said that he never swerved, changed the position of the bus either immediately before or right after the accident. On cross examination the witness stated that after seeing the bus, he looked to the front and did not see it again as he was under the impression that it was going to stop. It vtas stipulated that the Baton Rouge bus was eight feet in width and twenty-eight feet in length.
Lee Dunbar, called by plaintiff for cross examination, testified that on the day of the accident he was employed by the Continental Trailways and was driving its bus which was involved in the accident. He gave the following as his version of the accident: “Well, I approached the corner of St. Louis Street, and there is a flower shop on the corner, and the corner’s blind as it is, and there is an awning that completely encircles this flower shop, and when in an automobile, you’re down under the awning, but when you sit in a bus, this awning obstructs your view. You got to approach the corner and put the nose of your bus out, in other words, in a pedestrian lane where they would walk across the street, but just past, in order to get a complete view down the street of what is coming. In other words, you can’t stop hack behind the pedestrian walk and see what, a good view of the street. And I pulled up to where I could and I seen this City bus and from where he was down the street, I judged I had more than enough time to pull out in the traffic. And, like I said, I was angling up. You do angle up to that corner because America is a two lane-street and in order to make, save room for the traffic that might want to turn left from St. Louis to America, you’ve got to stay over on your right hand side. And when I started to pull out, I looked again, when you come from behind that blind corner, you take that second look when you get out to really where you can see down the street. You look back to really get your look and I seen then that the bus was coming faster than I had anticipated, much faster, and I stopped. My foot was on my brake, and when his bus went by, I was sitting at the wheel with my foot on the brake of the bus.” The witness explained the pedestrian walk referred to was where the sidewalk comes to America Street and crosses. The witness declined to estimate how far the city bus was when he first saw it but stated that he thought he had time to make his turn into St. Louis Street if it had been proceeding at a proper speed. He estimated the speed of the City Bus when he first saw it as being between 20 and 25 mph but that he had misjudged the speed in thinking that he had time to enter St. Louis Street.
*384 This witness, testifying in behalf of his employer, stated that during the noon recess of court he stepped off the distance from the southwest corner of the intersection to where the Baton Rouge Bus was when he first saw it and that it measured 71 steps or yards. He placed the position of the Baton Rouge Bus when he saw it the second time about 30 yards from the corner. He estimated its speed when he saw him a second time between 35 and 40 miles per hour. The witness stated that he brought his bus to a stop and that at the point where he stopped, there was room between the bus and the east curb of St. Louis Street for the City Bus to have passed. He stated that the driver of the Baton Rouge Bus made no effort to stop but that when he got real close to him, he thought there was an effort made to cut around to the right, and that while it seemed to him that he cleared the front of the bus, he didn’t clear the back of it and, consequently, the City Bus or rather the left rear portion of the City Bus collided with him. He said that he did not believe his bus was moved at all as a result of the impact.
On cross examination the witness stated that he had been employed by Trailways for a period of one month before the accident. Previous to this time he had been employed by the Herrin Transportation Company driving trucks and had never before handled a passenger bus. He had never before handled this particular run and this was the first time that he had ever driven a passenger bus out of America Street onto St. Louis Street. The witness admitted having made a report to the Baton Rouge police immediately after the accident at which time he stated that his vehicle went about a foot after the accident before coming to a complete stop, and, further, that he had “collided with the side of the City Bus.”
The above and foregoing makes the negligence of the driver of the Continental Bus apparent. He obviously erroneously assumed that he could make the left turn safely when he could not. Further, the photographs in evidence make untenable his position that his bus had come to a standstill and that it was struck by the Baton Rouge Bus as it turned to the right. The photographs show damage to the right of the Continental bus and a dent to the left side of the Baton Rouge Bus in front of its left rear wheel the appearance of which definitely indicates a direct blow rather than a glancing or “swiping” one such as it would have received if the accident had occurred as testified by Dunbar.
It appears from the trial judge’s reasons for judgment that he did not find evidence of excessive speed on the part of Houston but found him negligent in failing to see the Continental Bus earlier and in failing to avoid the collision by swerving to the right after he had seen it. While we agree that the record does not show excessive speed on the part of Houston we do not agree that he was negligent in acting as he did under the circumstances.
We have held repeatedly that right of way traffic is entitled to approach and enter an intersection even if traffic is observed approaching from an inferior street because the superior traffic is entitled to rely upon the assumption that the others will respect the superior’s right of way (see, for example, Commercial Credit Corporation v. Serpas et al., La.App., 94 So.2d 83), and we believe that here the driver of the Baton Rouge Bus was certainly entitled to that assumption and to proceed as he did. It must be remembered that there was nothing in the speed or the movement of the Continental Bus to make him apprehensive or to put him on his guard, but, on the contrary, that the speed and actions of the Continental bus in approaching the intersection were similar to the very manner in which he had observed these and other busses at this intersection over the years. We do not believe that the very slow “nosing out” of the Continental bus was indicative of any danger or a failure to yield the right of way and that the Baton Rouge bus driver, Houston, was completely within the rights accorded him by law in not anticipat *385 ing an accident and in proceeding on the assumption that one would not occur.
We now come to the question of quantum. As there is no dispute as to the items of special damage awarded the husband our consideration will be limited to the award to the wife for her physical injuries.
The record shows that Addie O’Conner is 56 years old and somewhat obese, being 5 feet 4 inches in height and weighing 164 pounds. She had been employed as a general house servant by Dr. J. P. Roumain, Jr. for some five years previous to the accident, and had a most excellent record as a faithful and reliable worker. She had not returned to work as of the date of trial on January 7, 1960.
As the result of the impact she was thrown from her seat to the aisle of the bus. She was struck on the head and, according to her, she lost consciousness and did not regain it until she was at the hospital.
She was taken to the Baton Rouge General Hospital by Ambulance. The ambulance driver picked her up from the floor of the bus. She was moaning and groaning, bleeding from the head, and appeared to be in an unconscious condition. She was unable to give her name or any information to the driver, and she could not walk.
Upon arrival at the hospital, she was placed under the care of Dr. D. V. Caciop-po. Dr. Cacioppo diagnosed the injuries as contusions of the left side of the face, left shoulder, left elbow, right knee and leg, and a lumbar strain. Dr. Cacioppo hospitalized her on the date of the accident, July 17th, and discharged her on July 22nd. Her course of treatment consisted of lying on an orthopedic mattress and the administration of analgesics for pain.
Dr. Cacioppo had x-rays taken which showed a narrowing of the lumbosacral disc in the region of the fifth lumbar vertebrae with prominent hypertrophic changes around it. Dr. Cacioppo was of the opinion that this condition pre-existed the accident, but that it was possible that this would make her more liable to injury and certainly would make her more liable to a slower recovery. The doctor stated that at the time of her discharge she was improving from her injuries. He thought that the average person should recover in about six to eight weeks from injuries of this type, but that her obesity, by placing an additional strain on her back, might aggravate her period of recovery. After her discharge from the hospital, Dr. Cacioppo became ill and did not see her again.
Dr. Howard Hansen examined the plaintiff at her home on July 28, 1959. At that time her neck was rigid due to muscle spasm so that she could not turn her head in any direction. She also had para vertebral muscle spasm with pain in her back to such a degree that she could not get out of bed by herself, and could not take care of herself at home. Dr. Hansen admitted her to the Lady of the Lake Hospital on July 29, 1959 where she remained until August 4, 1959. While in the hospital, Dr. Hansen had her placed in a cervical and back traction and on sedative and antispasmodic medication.
Dr. Hansen’s final diagnosis upon her discharge from the hospital, as shown by the hospital records (plaintiff exhibit 5) was post-traumatic aggravation of osteoarthritis of the spine, and acute cervical and lumbosacral sprain.
Dr. Hansen rendered two reports, one dated August 18, 1959, and the other dated December 31, 1959.
In the August 18th report, he concluded that the plaintiff had suffered from acute sprain of the cervical and lumbosacral spine, with right sciatic nerve root compression manifested by hypesthesia of the lateral surface of the right thigh and right calf, and that she still had the effects of chronic sprain of the lumbosacral spine. It was his opinion that it was impossible to predict the outcome of a case such as this, and even with the excellent improvement the plaintiff had shown there was a possibil *386 ity of complications and partial permanent disability.
In the report dated December 31, 1959, Dr. Hansen noted that he had examined the plaintiff on six occasions since August 18th. In addition, she had received physical therapy in his office almost daily. At the time of the last examination on December 31, 1959, she complained that her back would ache and be sore once or twice weekly, depending on the amount of stooping and activity she had done. She stated that she was unable to do heavy domestic work such as washing, ironing and scrubbing. Physical examinations revealed slightly limited forward flexion of the spine, but no other abnormalities on that date.
Dr. Hansen believed that she had received maximum benefit from regular treatment, and did not believe that it would be wise to subject her to heavy domestic work until she had been non-symptomatic for another six weeks. It was his opinion that it was impossible to determine at that time that she was fully recovered, or if she would have a significant permanent partial disability. He expected her to have intermittent periods of pain, aching, soreness and muscle spasm for another six months, even if she did not have traumatic aggravation of degenerative joint arthopathy of her spine. He estimated that she had about an 80% chance of full recovery.
Dr. Hansen found the plaintiff to be a cooperative patient, honest and sincere, with no evidence of malingering or psychoneurosis although at times she was nervous and tense.
Mr. Moss M. Bannerman, an orthopedist, examined the plaintiff one time on December 9, 1959, at the request of one of the defendants. At that examination the plaintiff complained of pain in the shoulder region at extremes of motions; pain at extremes of motion on straight leg raising; tenderness of the low back on the right side. The doctor examined the x-rays and notes degenerative changes in the low back which he associated with her age and body build.
The doctor was of the opinion that this patient had received multiple contusions and possibly a strain of her back. It was his belief that the complaints which she had were of mild discomfort, rather than true severity; that they should disappear over a period of time with no permanent disability; that she should be able to do her work with some discomfort; that aside from exercise to strengthen the muscles, no treatment was necessary henceforth.
It appears that Mrs. O’Conner was unable to do her work for a period of approximately one year. During this period she was suffering with pains. From the above and foregoing we believe that the award of the Lower Court was not sufficient and that justice would be better served by raising it. The sum of $5,000 strikes us as being fair under the circumstances.
For the reasons assigned it is now ordered, adjudged and decreed that the judgment appealed from be reversed in part in order that there be judgment in favor of defendant Baton Rouge Bus Company, Inc. and against the plaintiffs, rejecting the latter’s demands as to this defendant.
It is further ordered that the judgment appealed from be amended in that there be judgment in favor of plaintiff Addie O’Conner and against defendant Continental Southern Lines, Inc. in the amount of $5,-000 together with legal interest from judicial demand until paid.
It is further ordered that the judgment appealed from be and it is hereby in all other respects affirmed.
Reversed in part, amended in part and affirmed in part.